UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:18CR739-2 AGF(SPM) |
| LAMAR MCDONALD, | ) ) ) |
| Defendant. | ) ) |

**REPORT AND RECOMMENDATION
AND MEMORANDUM OPINION OF
UNITED STATES MAGISTRATE JUDGE**

All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Defendant Lamar McDonald is charged with conspiring to distribute and possess with intent to distribute methamphetamine from on or about August 2017 through June 2018, in violation of Title 21, United States Code, Section 846. After protracted litigation related to McDonald's competency, McDonald filed a series of pretrial motions including a motion to suppress evidence seized from 6003 Napier Avenue pursuant to a search warrant executed on June 13, 2018 (ECF No. 821), a motion to suppress evidence seized from 525 Rifle Ridge Road pursuant to a search warrant executed on June 13, 2018 (ECF No. 823), a motion to suppress evidence seized from electronic devices pursuant to a search warrant issued on August 15, 2018 (ECF No. 820), and a motion to suppress statements made to law enforcement on June 13, 2018 (ECF No. 824). The United States has filed responses opposing McDonald's motions. *See* ECF Nos. 837, 838, 839 and 843.

On January 17, 2025, the parties appeared for an evidentiary hearing and oral argument on all pending pretrial motions. At the hearing, FBI Special Agent Megan Schira testified about evidence seized pursuant to search warrants for 6003 Napier Avenue, 525 Rifle Ridge Road, and electronic

1

devices. The Court also admitted the relevant search warrant applications and search warrants into evidence. *See* Govt. Exs. 5, 6 & 7. At the hearing, the United States asserted that, consistent with its written response, it does not intend to offer any of the statements that are the subject of McDonald's motion to suppress statements at trial. *See* ECF No. 843 & ECF No. 859, p. 17-18. As such, the undersigned will recommend that McDonald's motion to suppress statements (ECF No. 824) be denied as moot.

At the end of the evidentiary hearing, the parties requested time to have a transcript prepared and file post-hearing briefs. Post-hearing briefing is now complete and the suppression motions discussed above are ready for a ruling.

**I.  MOTION TO SUPPRESS EVIDENCE SEIZED FROM 6003 NAPIER AVENUE (ECF NO. 821) AND 525 RIFLE RIDGE DRIVE (ECF NO. 823)**

McDonald requests an order suppressing evidence seized from 6003 Napier Avenue Drive and 525 Rifle Ridge Drive pursuant to search warrants issued by the undersigned on June 12, 2018. *See* ECF Nos. 821 and 823. The government's evidence in support of its position that the seizure did not violate the Fourth Amendment consisted of testimony by FBI Special Agent Megan Schira, the federal search warrant applications for both residences, the search warrant affidavit (which was the same affidavit for both addresses), the warrants authorizing the search of 6003 Napier in Case No. 4:18 MJ 7162 SPM (Govt. Ex. 5) and the search of 525 Rifle Ridge Drive in Case No. 4:18 MJ 7163 SPM (Govt. Ex. 6), and the search warrant returns for each property. McDonald's attorney cross-examined Agent Schira but otherwise the defendant did not offer any additional evidence. After carefully considering the evidence presented and the applicable law, the undersigned makes the following findings of fact and conclusions of law.

## FACTUAL FINDINGS

At the time of the evidentiary hearing, Megan Schira was an experienced Special Agent with the FBI who served on the Gateway Strike Force in St. Louis. *See* ECF No. 859 (Evid. Hrng. Tr.), p. 60-61. Agent Schira's decade's long experience included investigating narcotics-related and violent crimes, among others. *Id.* at 61. It was through her work with the Gateway Strike Force that Agent Schira participated in an investigation into Lamar McDonald. *Id.* Agent Schira prepared the affidavit in support of a search warrant for 6003 Napier Drive and 525 Rifle Ridge Drive, which she presented to the undersigned U.S. Magistrate Judge on June 12, 2018.[1] The undersigned authorized search warrants for both residences on the same date. *See* Govt. Exs. 5 & 6, and agents executed both warrants on June 13, 2018. *See id.*

In the affidavit, Agent Schira attested that, based on an investigation that began in August 2017, investigators learned that McDonald and Nathaniel Hill worked together with others to arrange the purchase and transportation of multiple pounds of methamphetamine from San Diego, CA to St. Louis, MO; and, in the past, divided each shipment between them. Govt. Ex. 5, at GOV-0001658-1660. Based on the investigation, Hill and McDonald had been distributing large amounts of methamphetamine in St. Louis for the past eleven months. *Id.* at GOV-0001659-1660. Investigators identified 6003 Napier, also identified in the affidavit as "Location #3", as McDonald's sister's house and as a place McDonald used to store his supply of narcotics and proceeds from narcotics sales. *Id.* at GOV-0001662-65. Through surveillance and other investigative means, investigators identified 525 Rifle Ridge, also identified in the affidavit as "Location #4", as McDonald's residence and a place McDonald used to store his supply of narcotics, proceeds, and documents associated with the DTO. *Id.* at GOV-0001663-64. The affidavit

---

[1] Agent Schira explained that at the time she presented the residential search warrants she was using her married name, Vassalli. As of the date of the hearing, Agent Schira had divorced and reverted to using her maiden name, Schira.

asserts that, based on the investigation, McDonald spent a large amount of time between 525 Rifle Ridge and 6003 Napier. *Id.*

In November 2017, pursuant to a federal search warrant, the Postal Inspection Service seized a package addressed to 525 Rifle Ridge, which investigators had identified as McDonald's residence. *Id.* at GOV-0001679. The package contained approximately 450 grams of Noscapine, a common cutting agent for heroin. *Id*. In November 2017, a confidential source, CS #2, told investigators that Hill was receiving large amounts of methamphetamine from San Diego. *Id.* at GOV–0001668. CS #2 stated that Hill and McDonald were distributing pound-level amounts of methamphetamine in St. Louis and that McDonald also distributed heroin. *Id.* Specifically, CS #2 identified Hill and McDonald as sources for methamphetamine purchases between June and September 2017. *Id.* CS #2 stated that s/he knew Hill as "BJ" and McDonald as "Mike" and referred to them as brothers; CS #2 also gave investigators Hill's and McDonald's phone numbers. *Id.* at GOV-0001669.

CS #2 also told investigators that s/he typically purchased methamphetamine from McDonald at 6003 Napier Drive and stated that McDonald usually drove a blue Dodge Ram. *Id*. at GOV-0001669-1670. CS #2 stated s/he had purchased between four ounces to half a pound of methamphetamine from McDonald during different transactions between June and September 2017. *Id.* CS #2 stated that McDonald stopped dealing with him/her in September or October 2017. *Id*. Investigators fully or partially corroborated information provided by CS #2 and Agent Schira attested to CS #2's reliability. *Id.* Phone records confirmed that the last contact between McDonald and CS #2 was in October 2017. *Id.* at GOV-0001671.

CS #2 subsequently made three controlled drug purchases from Hill starting in December 2017. *See id.* at GOV-0001669-76. Phone records show that, at least with respect to one of those controlled drug purchases, on February 27, 2018, Hill got two pounds of methamphetamine from

4

McDonald to complete the controlled purchase to CS #2. *Id.* at GOV-0001677-78. CS #2 told investigators s/he did not know Hill's source of supply for methamphetamine but knew that Hill made monthly trips to San Diego, California. On or about March 28, 2018, CS #2 told investigators that Hill told CS #2 that he had a half pound of methamphetamine for sale, but that CS #2 had to purchase it quickly because Hill was leaving the next day to travel to San Diego. *Id.* at GOV-0001671. The next day, on March 29, 2018, investigators observed Hill and another target, Earl Murray, fly to San Diego where they were picked up at the airport by McDonald. *Id.* at GOV-0001671. Investigators observed McDonald, Hill, and Murray together in San Diego until Hill and Murray flew back to St. Louis on March 31, 2018. *Id.* Investigators believed the three targets had traveled to San Diego to pay for a methamphetamine shipment. *Id.* at *Id.* at GOV-0001679.

On or about April 9, 2018, the Postal Inspection Service executed a search warrant on a package addressed to 6670 Mignon Drive and found it contained approximately ten pounds of methamphetamine. *Id.* at GOV-0001680. On April 20, 2018, McDonald and Hill had the following recorded call (excerpt):

MCDONALD: "nigga, we dead"

N.HILL: "What'd you mean dead"

MCDONALD: "nigga, we ain't bringing shit"

N.HILL: "Well, shit, he going to have to send some"

MCDONALD: "Nah, he ain't sending shit. He talking come get our brick here nigga"

N.HILL: that's what he said

MCDONALD: yeah

*Id.* Based on her training and experience and the training and experience of the investigative team, Agent Schira understood this conversation to mean that McDonald and Hill no longer had

methamphetamine to distribute because the package had been seized. *Id.* Based on this recorded call, agents also believed the source of supply would not mail any more narcotics and wanted Hill and McDonald to travel to California to get more narcotics. *Id.* The same day, Maurice Love, the source of supply, spoke to Hill and indicated that he had told "Marty," (McDonald), that "we" would have to get the bread back but that it wasn't easy "with the mail being fucked up." Love stated that he would "get the driver." *Id.*

Hill and Love subsequently arranged through text messages to bring at least fifteen pounds of methamphetamine to St. Louis and Love directed Hill to send MoneyGrams to Erika Quillar ($2500), Timothy Wright ($2500) and himself ($1500). *Id.* at GOV-0001681. On April 30, 2018, Hill went to a Days Inn in North St. Louis County to await the arrival of Love and Wright who were bringing the methamphetamine. *Id.* at GOV-0001681-82. During this period, Hill sent McDonald a text stating "Ima go to the crib (his house), get the bread (money) and leave the shit (narcotics) at the crib (house)." *Id.* at GOV-0001682. Surveillance of Hill, Love, McDonald, and Wright during the evening hours of April 30, 2018 through the early morning hours of May 1, 2018, showed Love and Wright arrive at the Days Inn in a Ford Fiesta; Hill then drove to his residence at 11333 Cadigan Lane, followed by Love and Wright in the Fiesta; a bag was removed from the Fiesta's trunk and taken into the residence; during this time, McDonald called Hill and stated: "Ya'll wanna meet me over there, ya know I gotta ride with that demo" to which Hill responded, "Right but shit I eh (inaudible) I wanta get to their room ya know he-he got this money on him I don't wanna, you know what I mean;" approximately two minutes later, Hill, Love and Wright left 11333 Cadigan Lane; Love placed a bag in the trunk of the Fiesta. Both cars eventually returned to the Days Inn. *Id.* at GOV-0001682-83.

During this same period of surveillance, investigators observed McDonald at 6003 Napier. *Id.* at GOV-0001683. He left the Napier residence carrying a small bag and entered a black Toyota Camry;

6

McDonald then called Hill who stated that he would be there in approximately five minutes and that the room number was 226; McDonald arrived at the Days Inn in a Toyota Camry and entered a room; approximately two minutes later, Hill, Love and Wright entered the same room; approximately ten minutes later McDonald, Love and Wright left the hotel room; Love and Wright left in the Fiesta; McDonald left in the Camry. *Id.* at GOV-0001683-1684. Agents concluded that McDonald continued to use 6003 Napier Drive to store his drug proceeds. *Id.* at GOV-0001685.

The warrant affidavit also attested that, during Hill's drug sales to customers, he referenced the fact that he needed to check with his brother—McDonald—to see if he had any methamphetamine left for sale. *Id.* at GOV-0001688. The affidavit describes a transaction between Hill and Doug Kelsay in June 2018, as an example of this interaction between Hill and McDonald. The affidavit attests that, based on court-authorized intercepts from Hill's phone, investigators believed Doug Kelsay was a methamphetamine customer of Hill's. *Id.* at GOV-0001687. In June 2018, when Doug Kelsay told Hill that he (Kelsay) needed to purchase narcotics, Hill told Kelsay, "uh, shit I'll have to call my brother, see what he got over there. What you need?" Kelsay replied, "man think he got eight (8) of'em?" Hill stated, "ight, ah let me ah let me call him and check real quick." *Id.* at GOV-0001688. Hill texted Kelsay that Kelsay might want to wait until Hill "gets mine in a couple of days, he wants 650 all the way across bro." *Id.* Kelsay stated he wanted four and Hill indicated that "[y]eah I'm a have him bring some now, I'll call you soon as I'm straight." *Id.* An hour later McDonald called Hill and Hill told him, "Bring one of them things foo." *Id.*

During this time, fixed surveillance observed a white Impala at 6003 Napier Drive and later at 11333 Cadigan. *Id.* at GOV-0001688-89. The next day, McDonald arrived at Hill's residence at 11333 Cadigan driving the white Impala. *Id.* at GOV-0001689. McDonald took a bag from the back seat of the car and gave it to Candace Hill, Nathaniel Hill's wife. *Id.* McDonald then left in the Impala. *Id.*

7

Subsequently, Hill texted Kelsay "I'm good now bro." *Id.* Hill and Kelsay later spoke by phone and discussed that McDonald preferred to sell his narcotics in smaller amounts at higher prices in order to maximize his profit (Hill: "He-he's the type he'd rather break it down to get all his money, like do you know what I mean?...It be so hard to get it, that's why he rather just sit on it then, slow play it he-he really slow playin to get all his money. No tellin how long its gonna take for people to come from…you know."). *Id.* at GOV-0001692. Investigators believed that defendant McDonald primarily used two locations to store his narcotics and proceeds, 6003 Napier Drive and 525 Rifle Ridge. *Id.*

Based on their investigation, investigators also believed that McDonald had access to firearms which were likely stored at 6003 Napier and 525 Rifle Ridge. *Id.* The affidavit attested that, at the time, McDonald was on probation for a firearms offense from 2016 and was arrested on May 12, 2018, with a firearm. *Id.* at GOV-0001692-93. The St. Peters Police report indicated that a 9 mm pistol with extended high-capacity magazine was found in a gym bag in the Camry being driven by McDonald. Police also found prescription medicine labeled for McDonald in the gym bag. *Id.* Investigators observed McDonald driving the Camry in March 2018 and had observed it at 6003 Napier and 525 Rifle Ridge on numerous occasions. *Id.* at GOV-0001694. Fixed surveillance at 6003 Napier revealed the same car parked near 6003 Napier. *Id.* Car rental records showed defendant rented the Camry from March 6, 2018, to May 17, 2018. *Id.* at GOV-0001694-95. A review of data received from the court-ordered Precision Location Information (PLI) on the telephone number (314) 853- 85183 (the telephone used by defendant) and physical surveillance showed that defendant spent a large amount of time at both 6003 Napier and 525 Rifle Ridge. *Id.* at GOV-0001697.

In addition, the affidavit attested that, based on their investigation, investigators believed that on or about May 28, 2018, McDonald and Hill gave Love $120,000 to purchase 50 pounds of methamphetamine. *Id.* at GOV-0001700. Further communications between Love and Hill indicated that

8

Love planned to bring the methamphetamine to St. Louis during the week of June 11, 2018. *Id.* at GOV-0001701. The affidavit attests that, a review of Missouri Department of Revenue records revealed that McDonald had not paid any state income tax for the preceding two years. *Id.* at GOV-0001695. Although he was the registered agent for a business entitled "Little Bounce House LLC," surveillance and intercepted communications only indicated one instance of McDonald conducting such business. *Id.* at GOV-0001695-1696. Despite a lack of reported income, McDonald had access to large quantities of cash. *Id.*

The warrant affidavit attested that, based on the training and experience of veteran members of the investigative team, the investigators believed that McDonald was likely using 6003 Napier to store and distribute ounce levels of narcotics to drug customers because of the large amount of activity at the house but believed that McDonald used 525 Rifle Ridge to store larger quantities of methamphetamine and cash. *Id.* at GOV-0001697. Finally, the warrant affidavit attested that, based on Agent Schira's experience and the collective experience of the investigative team, drug traffickers commonly keep contraband, drug proceeds, records, drug paraphernalia, firearms, airline tickets, computers, money orders, cancelled checks, phone records, photographs, currency, jewelry, evidence of occupancy, and safes at their residence or other buildings under their control. *Id.* at GOV-0001703-1705.

At the evidentiary hearing, Agent Schira testified that she did not provide the Court with any information not contained in the affidavit. *See* ECF No. 859, at p. 66. She also testified that she was placed under oath and swore to the truthfulness of the information in the affidavit, she and the issuing judge both signed the affidavit and application, and she had no reason to question the validity of the search warrant once it was signed by the issuing judge. *Id.* at p. 66-69.

9

**CONCLUSIONS OF LAW**

Because McDonald's suppression motion challenges the sufficiency of the residential search warrants, the Court's analysis begins with a review of the warrants and supporting affidavit.

*1. LEGAL STANDARD FOR REVIEW OF SEARCH WARRANTS*

"Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing *United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013)). *See also Johnson v. United States*, 333 U.S. 10 (1948); *Warden v. Hayden*, 387 U.S. 294 (1967); *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013); Fed. R. Crim. P. 41.

Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause may be found in hearsay statements from reliable persons, *Gates*, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, *Draper v. United States*, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, *McDonald v. United States*, 335 U.S. 451, 454 (1948). While these are some of the common ways in which probable cause is established, they are not all-inclusive.

Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. *Gates*, 462 U.S. at 230. It is well-established that, when the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of

probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citations and quotations omitted); *see also United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014); *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995).

After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference. *Gates,* 462 U.S. at 236. Thus, "[t]he affidavit should be examined under a commonsense approach that is not in a hypertechnical fashion." *Solomon,* 432 F.3d at 827 (citation and quotations omitted). *See also United States v. Ventresca,* 380 U.S. 102, 109 (1965); *Gladney,* 48 F.3d at 312 (explaining that "[a]ffidavits must be read in a common-sense and realistic fashion") (citations and quotations omitted). In applying this principle when reviewing the issuance of a warrant, this Court "afford[s] great deference to the issuing judge's probable-cause determination, ensuring only that the judge had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." *United States v. Petruk,* 929 F.3d 952, 959 (8th Cir.) (citations and quotations omitted; emphasis supplied), *cert denied,* 140 S. Ct. 510 (2019); *see also United States v. Daigle,* 947 F.3d 1076, 1081 (8th Cir. 2020) (citations and quotations omitted).

2. THE NAPIER AND RIFLE RIDGE WARRANTS WERE SUPPORTED BY PROBABLE CAUSE

Based upon the facts contained within the four corners of the affidavit, the Court finds that the Napier and Rifle Ridge Warrants were supported by probable cause. Specifically, Agent Schira's search warrant affidavit established that, based on the totality of the circumstances, agents had reason to believe McDonald and Hill were purchasing large quantities of methamphetamine from a source of supply in California and selling it in the St. Louis area. Specifically, the warrant affidavit reflected that McDonald sold methamphetamine to a confidential source (CS#2) at 6003 Napier between June and September 2017. The affidavit also attests that, after September 2017, McDonald supplied methamphetamine to Hill who, in turn, sold methamphetamine to CS#2. The affidavit also describes surveillance by

11

investigators which established that McDonald lived at 525 Rifle Ridge but also spent a large amount of time at 6003 Napier. The warrant affidavit also established that McDonald was supplying funds to purchase methamphetamine from the California source of supply and then splitting the methamphetamine with Hill to distribute.

     Based on surveillance by investigators, on or about April 30, 2018, co-conspirators Maurice Love and Timothy Wright drove from San Diego, California to St. Louis to obtain funds from Hill and defendant to purchase ten to fifteen pounds of methamphetamine after an earlier package of narcotics was intercepted by investigators. Investigators observed McDonald leaving the Napier residence carrying a bag to the Days Inn where he met with Love, Wright, and Hill in a hotel room. After about ten minutes McDonald was observed leaving the hotel room and Wright and Love drove back to San Diego.

     A little under two weeks before the warrant was issued, on or about May 28, 2018, Love and Wright flew to St. Louis. Hill texted Love that McDonald would pay $60,000 toward the 50 pounds of methamphetamine. Hill brought Love and Wright to his residence at 11333 Cadigan. A little over an hour later, McDonald arrived at Hill's home in a rented Impala. He stayed at the residence for an hour and then left in the Impala. The Impala was observed by investigators at both 6003 Napier and 525 Rifle Ridge. In sum, the search warrant affidavit established there was probable cause to believe McDonald was trafficking in large amounts of methamphetamine and used 6003 Napier and 525 Rifle Ridge to do so. The search warrant affidavit also established there was probable cause to believe evidence of McDonald's drug trafficking would be found at both locations.

     McDonald's argument that the affidavit relied on stale information is unavailing. As set out above, the search warrant affidavit demonstrated that as late as May 28, 2018, McDonald was observed by investigators engaging in suspected drug trafficking activities and using both 6003 Napier and 525

12

Rifle Ridge in furtherance of those activities. McDonald also argues the confidential informant never tied any drug activity to the Rifle Ridge address. However, the Eighth Circuit has held that an inference that evidence of drug trafficking will be found at a drug trafficker's residence can be made when the agents state that such an inference is based on their experience and the affidavit has established that the defendant continues to engage in drug trafficking. *United States v. Ross,* 487 F.3d 1120, 1123 (8th Cir. 2007). The affidavit in this case states that based on the training and experience of members of the investigative team they believed McDonald was using 525 Rifle Ridge to store larger quantities of methamphetamine and cash and was using 6003 Napier for smaller amounts of cash and narcotics. *See* Govt. Ex. 5, at GOV-0001758. The affidavit further stated drug traffickers commonly keep contraband, drug proceeds, records, firearms, airline tickets, computers, money orders, and other evidence at their residence or other buildings under their control. *See id.* at GOV-0001764-66. Indeed, looking at the affidavit holistically it describes McDonald's significant and continuous involvement in the trafficking of large quantities of methamphetamine from San Diego into the St. Louis area until days before the issuance of the search warrant.

### 3. THE GOOD FAITH EXCEPTION APPLIES

Evidence seized from 6003 Napier and 525 Rifle Ridge would be admissible under the *Leon* good-faith exception even if this Court somehow concluded that the affidavit did not establish probable cause. *United States v. Leon,* 468 U.S. 897, 922 (1984). As the Eighth Circuit recognized in *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015), there are four instances where the *Leon* good faith exception does not apply: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as

13

to render official belief in its existence entirely unreasonable;" and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Id.* McDonald has not argued, and cannot demonstrate based on the record, that any of the *Leon* exceptions apply here.

The good-faith inquiry asks, "whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Escudero*, 100 F.4th 964, 968 (8th Cir. 2024) (quoting *United Stats v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)). There is simply no evidence of record to support a finding that either Agent Schira or any other member of the investigative team had any reason to believe the searches of 6003 Napier and 525 Rifle Ridge were illegal despite the issuing judge's authorization. In sum, applying *Leon* to this case, McDonald's motion fails even if the warrants were, as he contends, insufficiently supported by probable cause. The evidence is admissible because it was objectively reasonable for the agents executing the search warrants to have relied on the magistrate judge's determination that there was probable cause to issue the warrants. *United States v. Johnson,* 848 F.3d 872, 879 (8th Cir. 2017).

**II.   MOTION TO SUPPRESS EVIDENCE SEIZED FROM ELECTRONIC DEVICES (ECF NO. 820)**

McDonald requests an order suppressing evidence from four cell phones that were seized at 525 Rifle Ridge on June 13, 2018, and searched pursuant to a search warrant issued by the Honorable Nannette A. Baker, on August 15, 2018.  *See* ECF No. 820. The government's evidence in support of its position that the seizure did not violate the Fourth Amendment consisted of testimony by FBI Special Agent Megan Schira, the federal search warrant application for the four cell phones, the search warrant affidavit, the warrant authorizing the search of the four cell phones, and the warrant return, filed in Case No. 4:18 MJ 5205 NAB (Govt. Ex. 7). McDonald's attorney cross-examined Agent Schira but otherwise the defendant did not offer any additional evidence. After carefully considering the evidence presented and the applicable law, the undersigned makes the following findings of fact and conclusions of law.

14

## FACTUAL FINDINGS

At the time of the evidentiary hearing, Megan Schira was an experienced Special Agent with the FBI who served on the Gateway Strike Force in St. Louis. *See* ECF No. 859 (Evid. Hrng. Tr.), p. 60-61. Agent Schira's decade's long experience included investigating narcotics-related and violent crimes, among others. *Id.* at 61. It was through her work with the Gateway Strike Force that Agent Schira participated in an investigation into Lamar McDonald. *Id.* Agent Schira prepared the affidavit in support of a search warrant for the four cell phones seized from 525 Rifle Ridge on June 13, 2018. Agent Schira presented the search warrant application to United States Magistrate Judge Nannette A. Baker on August 15, 2018.[2] *See* Govt. Ex. 7. On August 15, 2018, Judge Baker issued a warrant authorizing a search of the four cell phones seized from Rifle Ridge Drive, and agents executed the warrant on the same date. *See id.*

In the affidavit, Agent Schira attested that McDonald, co-defendant Nathaniel Hill, and others worked together to arrange the purchase and transportation of large amounts of methamphetamine from San Diego, CA to St. Louis for further distribution. *See* Govt. Ex. 7, at GOV 0001781. The affidavit attested that McDonald and Hill had separate locations to store narcotics, firearms, and proceeds from the sale of narcotics. *Id.* The affidavit asserts that in April and May 2018, United States District Court Judge John A. Ross issued court orders authorizing the interception of wire and electronic communications for the cellular number used by McDonald's co-conspirator Hill. *Id*. at GOV 0001782. The investigation revealed that McDonald used cellular telephone 314-853-5183 to communicate with Hill concerning their joint purchase and distribution of narcotics. *Id.* Intercepted calls revealed that

---

[2] Agent Schira explained that at the time the warrant was issued she was still using her married name, Vassalli. As of the date of the hearing, Agent Schira had divorced and reverted to using her maiden name, Schira.

15

McDonald and Hill were expecting to receive approximately 50 pounds of methamphetamine from their San Diego supplier on or about June 13, 2018.

The affidavit further asserts that, on that day, investigators observed co-defendants Love and Wright, the suppliers, arrive at 11333 Cadigan Lane. GOV-0001782. Investigators observed Love and Wright carry bags into the residence. *Id.* at GOV-0001782-83. A court-authorized interception of a text message from Hill to McDonald revealed that moments before the execution of residential search warrants Hill texted McDonald's phone: "Bro them made it…" *Id.* at GOV-0001783. Based on training and experience, the investigative team believed this text meant that Hill was informing McDonald that their suppliers had arrived at the Cadigan address with a large quantity of narcotics. *Id*. Shortly thereafter, four federal search warrants were executed simultaneously at four separate locations associated with the drug trafficking organization, including 6003 Napier, 525 Rifle Ridge Drive, and the residence on Cadigan. *Id.*

The affidavit attests that when agents executed the search warrant at the Cadigan residence, Hill, Love, and Wright were present along with approximately 59 pounds of methamphetamine and multiple firearms. *Id.* After being advised of his *Miranda* rights, Hill told investigators that, starting in May 2017, he and McDonald sold methamphetamine transported from California. *Id.* Initially, they shipped between three and ten-pound packages through the mail and split the packages. *Id.* For example, for a ten-pound package of methamphetamine, Hill would keep three pounds, and McDonald would keep seven pounds. *Id*. Hill said McDonald bought the narcotics for $3,500 per pound and sold it for approximately $11,000 per pound. *Id.* at GOV-0001783-84. Hill further stated he and McDonald planned to split the 50 pounds that had just been delivered. *Id.* at GOV-0001784.

The affidavit attests that, when agents executed the search warrant at 525 Rifle Ridge, McDonald was present and agents arrested him in the bedroom where they found four cell phones and more than

16

$40,000 in cash. *Id.* Agents also found an extended magazine for a handgun and an empty 9 mm drum magazine. *Id.* McDonald was arrested on an outstanding state warrant. *Id.* When agents executed the search warrant at 6003 Napier, which had been identified as a location used by McDonald to distribute narcotics, they found and seized multiple rifles, handguns, and magazines along with approximately 5 grams of fentanyl and a digital scale. *Id.* at GOV-0001784-85.

Agent Schira stated in her affidavit that, based on training and experience, defendants involved in narcotics distribution regularly use multiple cell phones to communicate with other persons involved in the criminal activity. *Id.* at GOV-0001785. She attested cell phones are used to send and receive text messages, photographs, short videos and other electronic data and voice communication. Such information can be retained on the phone. *Id.* She also attested that a forensic examiner may be able to recover evidence of narcotics distribution and co-conspirators, including photographs, text messages, videos, contact and address books, call history, and the geographical location of the cell phone during certain calls. *Id.* at GOV-0001786.

In sum, the search warrant affidavit sufficiently established that McDonald held a major role in a large-scale drug trafficking organization that brought large quantities of methamphetamine from San Diego to St. Louis and linked McDonald and his suspected drug trafficking activities to the four cell phones for which investigators sought a search warrant.

## **CONCLUSIONS OF LAW**

The Court's analysis begins, as it must, with a review of the warrant and supporting affidavit.

### 1. THE SEARCH WARRANT FOR THE CELL PHONES WAS SUPPORTED BY PROBABLE CAUSE

As with the residential search warrants discussed earlier in this memorandum opinion, Judge Baker's decision to issue a search warrant for the four seized cell phones must be supported by probable cause, which "depends on whether, under the totality of the circumstances, there is fair probability

17

evidence of a crime will be found in a particular place." *Faulkner*, 826 F.3d at 1144 (citing *United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013)). After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference. *Gates,* 462 U.S. at 236. Thus, "[t]he affidavit should be examined under a commonsense approach that is not in a hypertechnical fashion." *Solomon,* 432 F.3d at 827 (citation and quotations omitted). As such, in reviewing the issuance of the warrant at issue, this Court "afford[s] great deference to the issuing judge's probable-cause determination, ensuring only that the judge had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." *Petruk,* 929 F.3d at 959; *Daigle,* 947 F.3d at 1081.

Here, the warrant affidavit established that the four cell phones were seized from the bedroom of 525 Rifle Ridge Drive during the execution of a federal search warrant; that the residence had been identified as a location where McDonald stored narcotics and proceeds from narcotics sales; that McDonald, a target of the long-term drug trafficking investigation, was present in the bedroom with the four cell phones and $40,000 in cash at the time the residential search warrant was executed; and McDonald had used one of the four phones seized from the bedroom to confirm the arrival of 50-pounds of methamphetamine into the St. Louis area. The affidavit also established McDonald's role as a major player in a drug trafficking organization that was transporting large quantities of methamphetamine into the St. Louis area.

The affidavit also explained that a forensic examiner may be able to recover evidence of narcotics distribution from the cell phones, including photographs, texts, videos, call history and contact information. Indeed, the Eighth Circuit has recognized cell phones as a tool of drug traffickers. *United States v.Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) ("[D]rug traffickers typically carry multiple cell phones to allow for the disposal of one or more, if necessary to avoid detection."); *United States v. Lazcano-Villalobos*, 175 F.3d 838, 844 (10th Cir. 1999) ("[C]ellular telephones are recognized

18

tools of the drug-dealing trade."); *United States v. De La Cruz*, 996 F.2d 1307, 1311 (1st Cir. 1993) (describing cell phones as "well known tools of the drug trade"); *United States v. Delva*, 13 F.Supp.3d 269, 276 (S.D.N.Y. 2014) ("Courts have routinely denied motions to suppress the seizure of cell phones, in the context of narcotics conspiracies, based on knowledge that the phones may contain contacts and other evidence of a crime."); *United States v. Meregildo*, 2012 WL 4378047, at *4 (S.D.N.Y. Sept. 24, 2012) ("Because law enforcement suspected [defendant's] involvement in racketeering and narcotics conspiracies—whose members used cellular phones and social media to facilitate their criminal acts—the iPhone and iPod Touch ... were immediately identifiable as evidence of criminal conduct."); *United States v. Reyes*, 2007 WL 419636, at *6 (D. Conn. Jan. 30, 2007) ("It was immediately apparent to [the] trained DEA agent with over ten years of law enforcement experience, that cellular telephones contain caller logs, text messages, phone books and other information that would be highly relevant to a drug prosecution and would be very likely connected with criminal activity.").

In sum, the affidavit established that, based on the totality of circumstances, there was probable cause that McDonald was actively involved in trafficking in large amounts of methamphetamine and the seized cell phones would contain evidence of such dealings.

### 2. THE GOOD FAITH EXCEPTION APPLIES

As with the evidence seized pursuant to the residential search warrants discussed above, evidence seized from the four cell phones would be admissible under the *Leon* good-faith exception even if the Court were to determine that the affidavit did not establish probable cause. The good-faith inquiry asks, "whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *Escudero*, 100 F.4th at 968. Here, McDonald has offered neither evidence nor argument suggesting that agents had any reason to believe the search of the cell phones was illegal despite Judge Baker's authorization. Thus, McDonald's motion to suppress fails and

19

must be denied irrespective of whether there was probable cause for the warrant. *See United States v. Norey,* 31 F.4th 631, 635 (8th Cir. 2022).

Accordingly, for the reasons stated in this memorandum opinion,

**IT IS HEREBY RECOMMENDED**, that Defendant's Motion to Suppress Evidence Seized from Electronic Devices (ECF No. 820) be **DENIED**.

**IT IS FURTHER RECOMMENDED,** that Defendant's Motion to Suppress Evidence seized from 6003 Napier Avenue (ECF No. 821) be **DENIED**.

**IT IS FURTHER RECOMMENDED**, that Defendant's Motion to Suppress Evidence seized from 525 Rifle Ridge Road (ECF No. 823) be **DENIED**.

**IT IS FINALLY RECOMMENDED**, that Defendant's Motion to Suppress Statements (ECF No. 824) be **DENIED, as moot**.

The parties are advised that they have fourteen (14) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir. 1990).

Trial in this case will be set before the Honorable Audrey G. Fleissig, by separate order.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated: August 19, 2025